UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AAA LIFE INSURANCE COMPANY, | : | NO.: 1-10-cv-00158 |
| Plaintiff | : | |
| | : | JUDGE CONNER |
| v. | : | |
| | : | MAGISTRATE JUDGE METHVIN |
| DEBORAH A. KNEAVEL, | : | |
| GUIDETTA ALICE KNEAVEL, | : | |
| MARY A. McALLISTER, and | : | |
| ST. JUDE CHILDREN'S RESEARCH | : | |
| HOSPITAL | : | |
| Defendants | : | |

REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR
SUMMARY JUDGMENT AND MOTION TO STRIKE
(Docs. 25, 31, 33)

AAA Life Insurance Company filed this interpleader action on January 10, 2010, asking the court to determine the proper distribution of a $100,000 death benefit payable under a life insurance policy owned by Clemens Kneavel, who died on November 8, 2009. Plaintiff named as defendants Clemens' wife, Deborah Kneavel ("Deborah"), his two sisters, Guidetta Alice Kneavel ("Alice") and Mary A. McAllister ("Mary"), and St. Jude Children's Research Hospital. Mary has not filed responsive pleadings or otherwise stated a claim for the proceeds.[1] St. Jude's acknowledged it was not a beneficiary and was voluntarily dismissed on September 19, 2011 (Doc. 44). The dispute over the proceeds therefore appears to involve only Deborah and Alice.

---

[1]  Alice's attorney, Douglas P. France, filed a notice of appearance on Mary's behalf. (Doc. 18).

2

Although the complaint does not address jurisdiction, it appears the court has diversity jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a Michigan company, the individual defendants are all Pennsylvania residents, St. Jude's Children's Research Hospital (now dismissed), is a Tennessee company, and there is more than $75,000 at issue.

Discovery is now complete. Before the court are cross-motions for summary judgment filed by Deborah and Alice (Docs. 25, 31). Deborah also filed a motion to strike (Doc. 33), as untimely filed, Alice's motion for summary judgment (Doc. 31); brief in support of her own motion and in opposition to Deborah's motion (Doc. 30); counter-statement of material facts (Doc. 29), and "response" to Deborah's motion (Doc. 28).

The motions have been referred to the undersigned magistrate judge for a report and recommendation[2] and are now ripe for adjudication.[3]

---

[2] On July 7, 2011, Judge Conner referred the motions to the undersigned magistrate judge. (Doc. 38.)

[3] The full procedural history is as follows: On February 22, 2010, Deborah filed an answer with cross-claims against the other three defendants (Doc. 3; later amended on March 23 (Doc. 10)). Alice filed an answer to the complaint and to Deborah's cross-claim, and her own cross-claim against Deborah on March 23, 2010. (Doc. 11.) Deborah answered Alice's cross-claim on April 6. (Doc. 12.) Upon completion of discovery, Deborah filed a motion for summary judgment (Doc. 25) on April 18, 2011, along with a statement of facts (Doc. 26), several supporting exhibits (Docs. 26-1 to 26-13), and a brief in support (Doc. 27). On May 18, 2011, Alice filed a response (Doc. 28) to Deborah's motion, as well as her own motion for summary judgment (Doc. 31), a brief in opposition to Deborah's motion and in support of her own (Doc. 30), and a counterstatement of facts (Doc. 29).Within the next two weeks, Deborah filed a motion to strike (Doc. 33) Alice's motion and supporting documents as untimely, a brief supporting this motion (Doc. 34), an answer to Alice's counterstatement of facts (Doc. 35) and one supporting exhibit (Doc. 35-1), a reply brief supporting her own motion for summary judgment (Doc. 36), and an

(continued...)

3

***Findings and Conclusions***

## I. Factual Background

An understanding of the relationships of the claimants to the decedent is helpful in assessing the motions before the court. The factual background is substantially undisputed.

Alice, Clemens, and Mary are siblings. Their mother committed suicide when Alice was 4 ½, Clemens was 3, and Mary was five months old (Doc. 26-2, at 5-6 (Alice Dep. at 12–18)). In the immediate aftermath of this event, all three children moved in with a maternal uncle. Mary was eventually adopted by a cousin. After a period of time, Alice and Clemens returned home and were raised by their father and stepmother (*Id.*). Alice lived at home until she completed college and began working in 1972 (*Id.*, at 8, (Dep. at 23)). Clemens was drafted into the Army at age 18, and completed one tour of duty in Vietnam (*Id.*, at 7 (Dep. at 19)). After his return from Vietnam in the mid-1970s, Clemens struggled with post-traumatic stress disorder and abused drugs and alcohol. He worked only intermittently and went to jail numerous times on drug and drunk-driving charges (*Id.*, at 9–10 (Dep. at 27–33)). Clemens' father "wouldn't take him back," and he moved in with Alice after he lost his own apartment due to drugs (*Id.*, at 7 (Dep. at 20–21)).

---

[3](...continued)
identical brief in opposition to Alice's motion (Doc. 37).  All filing deadlines on these three motions have now passed.

4

Clemens lived predominantly with Alice from the mid-1970s until Alice's marriage in 2003, with the exception of a period from the late 1970s until 1986, when Clemens lived with his stepmother following his father's death. (*Id.*, at 9, 13–17 (Dep. at 28–30, 46–59)). Even after Alice's marriage, Clemens often spent the night with Alice and her husband until his own marriage to Deborah on April 16, 2006. (*Id.* at 26–27 (Dep. at 98–102); Doc. 26, ¶ 6).

Clemens did not pay Alice rent during the years he lived with her (Doc. 26-2, at 18 (Alice Dep. at 64)). Alice claimed Clemens as a dependent on her income tax returns from 1988 until 2002. (*Id.*, Dep at 59–69).  In her deposition, Alice testified that she continued to let Clemens live with her despite alcohol, drug, and anger issues because of a promise she made to her father:

> I had promised my father that I would try to take care of him. When he came back from Vietnam, my father was worried about him. And even before that, when my mother killed herself, my father tried his best to keep us together. He said to always look out for each other. And before he died, he asked me to try and look out for Clemens the best I could.

(Doc. 26-2, at 10–11, (Dep. at 34–35)).

Alice and Clemens' stepmother first proposed the idea of Alice taking out an insurance policy on Clemens' life in the late 1980s, when she asked Alice to take Clemens back into her home. (*Id.*, at 23 (Dep. at 84)). According to Alice, her stepmother pointed out that Clemens "doesn't have any money; he has nothing," and "you might as well take out an insurance policy on him. You work in insurance, you know how to do

5

that." (*Id.*) The proposal was not pursued for several years, but Alice and Clemens eventually discussed it and agreed that a policy would be obtained, Alice would make all premium payments, and Alice would be the beneficiary. (*Id.*, at 23 (Dep. at 84–85)).

On April 15, 1995, Clemens applied for a $100,000 life insurance policy with an effective date of June 15, 1995, with Alice listed as the 100% beneficiary. (Doc. 11-2, at 1–2.) There is no dispute that Clemens was listed as the policy owner and the insured, but that Alice paid all of the premiums on the policy from 1995 until Clemens' death in 2009.[4] Copies of Alice's checks showing annual premium payments were attached as Exhibit C to her deposition (Doc. 26-2, at 20–23, 51 (Dep. at 73–83, 198)).[5] Alice testified that the purpose of the life insurance policy was "[t]o repay me for all the time that I had taken care of him that I allowed him to live with me." (*Id.*, at 23 (Dep. at 83).

Clemens met his future wife, Deborah, at an AA meeting in April 2003. (Doc. 26-6, at 10 (Deborah Kneavel Dep. at 10:7). Clemens moved in with Deborah around August of 2003, but moved back in with Alice and her husband in October of 2005 (*Id.*, at 16–17 (Dep. at 16–17)). In approximately February or March of 2006, Deborah learned that there was a life insurance policy on Clemens' life with AAA Insurance Company. (*Id.*, at 24 (Dep. at 24:21–24)). On March 21, 2006, Clemens executed his a Request for Change

---

[4]  Deborah's Concise Statement of Material Facts (Doc. 26) states at ¶ 2 that "Payments on the Policy were made by Clemens's sister, Alice Kneavel. ('Exhibit B', Alice Kneavel Deposition, 84:23 to 85:3)."

[5]  There is no dispute that all premiums were properly paid. (Compl. ¶ 7, Doc. 1; Deborah's Am. Answer ¶ 7, Doc. 10; Alice's Answer ¶ 7, Doc. 11.)

6

of Beneficiary/Name (RCBN) form, listing his beneficiaries as Deborah Kneavel (60%), Alice Kneavel (30%), and Mary McAllister (10%). (Doc. 26-5.)[6] Although Deborah was listed as his wife, they were not, in fact, yet married.

Deborah and Clemens married on April 16, 2006. (Doc. 26-6, at 22 (Deborah Kneavel Dep. at 22:15–16); Certificate of Marriage, Doc. 26-4.)[7] About a week later, Clemens finished moving his things from Alice's house and was "officially" living with Deborah. (Id.)

The parties have submitted a total of twelve RCBN forms purportedly executed by Clemens between April 16, 2001 and October 31, 2008. Ten of the forms were attached to the complaint, including a form which Deborah purportedly signed before a notary on October 31, 2009, eight days before Clemens' death of liver cancer, but which was not signed by Clemens. (Doc. 1, at 9). The latter RCBN names Deborah as the 95% beneficiary on the policy and Alice as a 5% beneficiary. The previous RCBN, dated September 11, 2008, had listed Alice as the 100% beneficiary. (Id., at 10).

Two more versions of the October 31, 2009 RCBN have been submitted, however, both of which purportedly contain Clemens' mark, although the marks are different, and all three versions of the October 31, 2009 RCBN bear other differences. One version,

---

[6] Mary's 10% share was entered under the "contingent beneficiary" part of the form, but apparently Clemens meant for her to be a primary beneficiary since the other beneficiaries' shares only equal 90%.

[7] Deborah's SMF erroneously states the date as April 13, 2006. (Doc. 26, ¶ 6).

with a clear but shaky "X" mark, was submitted by Deborah with her Amended Answer and Cross-Claim (Doc. 10-2).[8] However, another version of the form, with a "ski slope" mark, was apparently the version received by AAA Insurance Company. (Doc. 35-1, at 5). A copy of a letter from counsel for AAA Life Insurance Company explains that the company received the unsigned RCBN form via telefax, and later received in the mail the same RCBN, this time bearing the "ski slope" mark purportedly made by Clemens. (*See Id.*, Letter from AAA's counsel submitted as "Exhibit A" to Deborah's Response to Counterstatement of Material Facts).

A careful examination of the three documents dated October 31, 2009, reveals other anomalies. For instance, the unsigned form bears a fax notation of October 30, 2009, even though Deborah's notarized signature is dated "10/31/09." (*See* Doc. 35-1, at 7). In addition, the date "10/31/09" next to Clemens' "X" mark is different from the same date entered next to the "ski slope" mark. (*Compare* Doc. 35-1, at 5, with Doc. 10-2). Furthermore, the notarial stamp appears to be in a different place on the two "marked" documents, even though Deborah's signature and notation that "I did not sign or give authorization for my name to be removed as irrevocable Beneficiary," appear to be the same. (*Id.*).

---

[8] The identical version was submitted with "Exhibit E" of Deborah's Concise Statement of Material Facts (Doc. 26-5, at 9).

8

Deborah contends that she took the unsigned, unmarked form to the bank, where it was notarized and faxed to AAA. (Deborah's Stmt. of Facts ¶¶ 10–11, Doc. 26.) Later that day, Deborah took the notarized form home and reviewed it with Clemens, who "insisted that he make his mark on the document." (Deborah's Stmt. of Facts ¶ 12–13, Doc. 26.) Clemens, weak and close to death, did not have the strength to write; Deborah held his wrist as he scratched an "X" on the signature line of the RCBN form. (Doc. 26, Deborah's Stmt. of Facts ¶ 14; Doc. 26-11). Deborah then mailed the form bearing Clemens' mark to AAA. (Doc. 26, Deborah's Stmt. of Facts ¶ 15). This account does not explain the October 30 fax date, or address the second "marked" version of the RCBN dated October 31, 2009.

## II. Standard of review

### A. General Standard

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

9

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every

element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

### B. Cross Motions for Summary Judgment

Here, the claimants have filed cross-motions for summary judgment. As this court has observed, "the mandate of Rule 56 that the court view all facts in the light most favorable to the non-moving party may be difficult to apply where all parties are both moving and non-moving parties." *Falls v. State Farm Ins. Mut. Auto. Ins. Co.*, 774 F.Supp.2d 705, 709 (M.D. Pa. 2011) (Jones, J.). In appropriate cases, the court may decide to issue separate opinions on each motion. However, where, as here, the facts are essentially undisputed, or where the disputed facts are easily analyzed in the context of the issues presented, considerations of judicial economy dictate that one memorandum opinion should be issued. *Id.* (citing *Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F.Supp.2d 230, 235 (M.D.Pa.2004).

## III. Discussion

### A. Deborah Kneavel's Motion to Strike (Doc. 33)

The motion to strike will be addressed first, since, if granted, it will dispose of Alice's dispositive motion and related filings. It hardly bears noting, however, that given the hotly disputed facts of this matter, summary judgment would not be proper even if Alice's motion were considered on the merits.

April 18, 2011 was the extended deadline for filing dispositive motions with supporting briefs (Doc. 24). Deborah alone met the deadline, filing her motion for summary judgment on the deadline date. Under LR 7.6, the deadline for filing an opposition to Deborah's motion was 21 days later, or May 9, 2011.[9] On May 18, 2011, nine days after the deadline, and one month after the date for filing dispositive motions, Alice Kneavel filed the following:

1. "Answer" to Deborah's motion for summary judgment (Doc. 28).
2. Counterstatement of material facts (Doc. 29).
3. Brief in opposition to Deborah's motion for summary judgment and in support of Alice's motion for summary judgment (Doc. 30).
4. Motion for summary judgment (Doc. 31).

---

[9] Local Rule 7.6 requires "a brief in opposition to a motion for summary judgment and LR 56.1 responsive statement, together with any transcripts, affidavits or other relevant documentation, shall be filed within twenty-one (21) days after the service of the movant's brief."

Before the court is Deborah's motion to strike these pleadings as untimely, and on other procedural grounds (Doc. 33). No opposition to the motion to strike has been filed by Alice.

Alice has at all times been represented by counsel, at no time sought an extension of time to file an opposition to Deborah's dispositive motion, or to file her own dispositive motion, and has offered no excuse for filing these pleadings late. Accordingly, it is recommended that Alice's late-filed pleadings be stricken as untimely filed.

### B. Deborah Kneavel's Motion for Summary Judgment (Doc. 25)

Deborah contends in her dispositive motion that the last change of beneficiary form "was properly executed . . . by Clemens Kneavel making his mark and the mailing of the policy [to AAA] on October 30, 2009." (Doc. 25, ¶ 2.) In fact, as discussed above, all three versions of the last RCBN form were purportedly signed on October 31, 2009, not October 30, although the version lacking Clemens' signature apparently was faxed on October 30, 2009.

Deborah concedes that the presumption of Clemens' competency can be overcome by clear and convincing evidence. (*Id*. at ¶ 3). In her lengthy deposition, Deborah testified regarding Clemens' condition on October 31, 2009, and admits that Clemens was on morphine at the time (Doc. 26-6, at 77:1–2). Deborah also admits that Clemens was too weak to sign his name, and that Deborah held his wrist as he scratched an "X" on the change of beneficiary form in her favor.

13

Deborah claims that she is entitled to 95% of the proceeds of Clemens' life-insurance policy in accordance with the "X" version of the RCBN form dated October 31, 2009. (Doc. 26-11.) No party has addressed the significance of the "ski slope" form which AAA Life's counsel identified as the version it received. Deborah claims, in the alternative, that if the October 31, 2009, form is invalid, she is entitled to 75% of the policy proceeds per an RCBN form dated August 18, 2008. (Aug. 18, 2008, RCBN Form, Pl.'s Exh. B, at 8, 11, Doc. 1, at 11). It is noted, however, that an RCBN dated September 11, 2008 names Alice as the 100% beneficiary of the policy. (Doc. 1, at 10).

As discussed above, Deborah's own documents and testimony establish genuine and deep disputes as to the material facts surrounding the execution of the RCBN forms on October 30–31, 2009, particularly Clemens' competency and her role in the execution of the forms in her favor. Furthermore, it is clear that credibility of the witnesses will be highly determinative of the disposition of the claims before the court. Accordingly, Deborah has not established entitlement to summary judgment.

**IV. Conclusion**

For the foregoing reasons, it is recommended that this Court **GRANT** Deborah Kneavel's motion to strike, and that Alice's motion for summary judgment (Doc. 31); brief in support/opposition (Doc. 30); counterstatement of material facts (Doc. 29), and "response" to Deborah's motion (Doc. 28) be stricken as untimely filed.

14

It is further recommended that the court **DENY** Deborah A. Kneavel's motion for

summary judgment.

Signed on December 7, 2011.

_____

MILDRED E. METHVIN
UNITED STATES MAGISTRATE JUDGE